IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                                  No. CR 12-1163 RB

THEODORE OLGUIN,

      Defendant.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

**THIS MATTER** is before the Court on Defendant's Motion to Suppress, filed November 1, 2012. (Doc. 21). Having carefully considered the submissions of counsel, relevant law, evidence adduced at the November 27, 2012 hearing, and being otherwise fully advised, the Court **DENIES** Defendant's motion.

### FINDINGS OF FACT

Federal Rule of Criminal Procedure 12(d) provides that when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. The Court makes the following factual findings based on the evidence adduced at the evidentiary hearing, including the videotape of the traffic stop, exhibits, and testimony from former Artesia Police Department ("APD") Officer Terry Colwell, former APD Sergeant Jarod Zuniga, and Defendant Theodore Olguin. The Court notes that the majority of the facts are undisputed. The sole disputed fact for purposes of this motion is whether Defendant's front driver's side and

passenger side windows were rolled up or down when he drove by Officer Colwell on the morning of February 23, 2011.[1]

1. On February 23, 2011, at approximately 1:54 a.m., Officer Colwell was on patrol on Main Street in Artesia, New Mexico.

2. The weather was quite cold and windy in the early morning of February 23. Sergeant Zuniga estimated that the temperature during the graveyard shift that night was just below freezing and that, combined with the wind chill, it felt as though the temperature was around twenty degrees Fahrenheit.

3. Aside from the officers and Defendant, there were no other vehicles driving on the road at the time that Officer Colwell encountered Defendant.

4. Officer Colwell noticed Defendant's vehicle because it was traveling at a high rate of speed. As the vehicle passed him going in the opposite direction, Officer Colwell noted that it was a 1999 green Ford Expedition with darkly tinted windows. Officer Colwell believed that the window tint violated state law and municipal code.

5. The tint on the Expedition's front-side, rear-side, and rear windows caused the windows to transmit less than twenty percent of the light to which they were exposed.

6. Officer Colwell recognized the Expedition, as he had stopped and cited the driver of this vehicle on at least one other occasion for the same window tint violation. He also recognized the driver of the Expedition as Defendant.

7. When Officer Colwell passed the vehicle, all of the windows were rolled up. The Court makes this finding based on the testimony of Officer Colwell, the freezing temperature, the complete absence of other traffic on the road, and the statements made by Defendant

---

[1] Though Mr. Colwell and Mr. Zuniga are no longer police department employees, the Court will refer to them using their titles at the time of the traffic stop.

and recorded by Officer Colwell after Defendant was stopped. Immediately following the stop, Officer Colwell asked Defendant, "Why don't you have your windows rolled down?" Defendant replied, "Because it's cold."

8. The videotape from the camera on Officer Colwell's vehicle does not show the status of Defendant's windows at the relevant time.

9. Defendant testified that all of the windows were rolled down. However, the Court deems his testimony on this point incredible. The weather that night was quite cold, and there were no other vehicles on the roadway. Thus, even if Defendant ordinarily kept his windows down for safety purposes, there was little need for him to do so on the night in question. Though the officers testified to the contrary, Defendant testified that APD officers had not advised him that they would not pull him over if his windows were down; consequently, he had no incentive to keep the windows down on a cold night.

10. Officer Colwell turned to follow the Expedition and then activated his emergency equipment. The Expedition did not immediately pull over. Officer Colwell reported to dispatch that he was attempting to pull over the Expedition but it was not stopping.

11. At some point while Officer Colwell was following Defendant, Defendant rolled down his driver's side window.

12. When Officer Colwell reported over the radio that the Expedition was not stopping, Defendant reached his hand out of the window and indicated that he would be turning to pull over. Defendant admitted that he had a police scanner in his vehicle and that he made the hand gesture because he overheard Officer Colwell's statement. Defendant drove for approximately twenty seconds before pulling over, an action which Officer Colwell described as uncommon.

13. Defendant explained that he did not pull over immediately because he did not see that Officer Colwell was behind him. This supports the Court's finding that the windows were up: the dark tint would have made it difficult to see Officer Colwell's lights, and Defendant likely would have seen Officer Colwell sooner had the windows been down.

14. Once Defendant pulled over, Officer Colwell stopped behind the Expedition and exited his vehicle to approach Defendant. At that time, Sergeant Zuniga, who was in a separate vehicle, drove up from the opposite direction. Sergeant Zuniga advised Officer Colwell over the radio that Defendant was moving around inside the vehicle quite a bit, "digging" either in the center console or passenger seat area.

15. Officer Colwell interpreted this statement to mean that Defendant could be looking for a weapon or trying to hide something; as such, his awareness and concern for his safety were heightened.

16. Defendant testified that he was reaching for his insurance and registration, which were in his glove box.

17. Officer Colwell approached on the driver's side of the Expedition and Sergeant Zuniga approached on the passenger side. At this point, the front-side windows were rolled down at least partially.

18. Officer Colwell and Sergeant Zuniga had come into contact with Defendant in the past. Both were aware that Defendant almost always carried a knife on his belt.

19. Based on prior stops, Officer Colwell and Sergeant Zuniga were aware that Defendant often carried a single golf club or a single baseball bat in his vehicle within reaching distance of the driver's seat. They characterized those items as blunt force weapons

because the bat appeared damaged to a degree not consistent with sports use and the golf club was not accompanied by other items that one would expect a golfer to carry.

20. Sergeant Zuniga was also aware that other officers had found shell casings from ammunition in previous searches of Defendant's Expedition.

21. During the course of the stop, Sergeant Zuniga noticed that Defendant was more nervous than usual, as compared to his prior experience with Defendant.

22. Officer Colwell noticed that there were several knives stored on the passenger side visor of the Expedition that night. Sergeant Zuniga saw the handle of what appeared to be a knife in the visor. Both officers testified that they had not noticed those knives during prior stops.

23. Defendant had made direct threats to Officer Colwell and Sergeant Zuniga on two occasions in the months prior to February 2011. In November 2010, Officer Colwell and Sergeant Zuniga came into contact with Defendant when executing an arrest warrant on a third party. Defendant was recording the officers and essentially said that they had better watch their backs. He made a second threat prior to February 2011 when he was stopped by Officer Colwell for a window tint violation, stating that someone was going to get the officers. Based on these threats, Sergeant Zuniga ordered his patrol officers to call for an additional unit anytime they encountered Defendant. Sergeant Zuniga intended this as a measure to ensure his officers' safety. Defendant had never been charged with a crime based on those threats, and no written records were made.

24. Sergeant Zuniga also received notice indirectly from a deputy with the Eddy County Sheriff's Department that Defendant had threatened to shoot his house as well as the houses of Officer Colwell and another officer.

25. At the time of the stop, both Officer Colwell and Sergeant Zuniga were aware that Defendant was a suspect in shootings that had occurred on January 15 and February 15, 2011 outside of two APD officers' homes. This heightened Officer Colwell and Sergeant Zuniga's concern for their safety.

26. Sergeant Zuniga asked Defendant to exit the vehicle. Defendant complied, and Officer Colwell patted down the exterior of Defendant's clothing. Officer Colwell inquired as to whether Defendant had any knives on his person, and Defendant replied, "Not really[.]" However, Officer Colwell did find a knife on Defendant.

27. Sergeant Zuniga conducted a protective sweep of the Expedition's passenger compartment. Almost immediately, he found a handgun between the center console and the passenger side front seat. He removed the magazine and found ammunition. Defendant was ultimately placed under arrest based on the discovery of the handgun and ammunition.

28. Officer Colwell was terminated from his employment with APD due to an internal investigation regarding an argument that he had with an Assistant District Attorney. The internal investigator found that Officer Colwell was untruthful about whether or not he shouted during the argument. The law enforcement academy board subsequently exonerated Officer Colwell of any wrongdoing. The Court finds that APD's termination of Officer Colwell and the underlying circumstances have no bearing on the issue before the Court.

## LEGAL STANDARDS

1. Defendant moves to suppress all evidence obtained from his detention and the protective sweep of his vehicle on February 23, 2011. In support of his motion, Defendant asserts

that (1) the traffic stop of his vehicle was not justified because he did not violate N.M. STAT. ANN. § 66-3-846.1, the New Mexico statute restricting window tint, (2) the protective sweep of his vehicle by Sergeant Zuniga was not justified, and (3) the traffic stop and protective sweep were pretextual. (Motion to Suppress, Doc. 21, at 2-3). The United States contends that the stop was valid because Defendant's windows were rolled up at the time that he passed Officer Colwell and the search was justified by officer safety concerns. (United States' Response to Defendant's Motion to Suppress, Doc 30, at 8-13).

2. The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. Ordinarily, probable cause is required before an officer can conduct a search or seizure. *United States v. Whitley*, 680 F.3d 1227, 1232 (10th Cir. 2012) (citations omitted). However, the Supreme Court has established an exception allowing law enforcement officers to approach citizens and investigate possible criminal behavior without probable cause in certain circumstances. *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011). This type of investigative detention is "justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *Id.* (quotations omitted).

3. Routine traffic stops are much like investigative detentions, and the Tenth Circuit has held that the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), "guide [the] Court's determination as to the reasonableness of a traffic stop." *United States v. McGehee*, 672 F.3d 860, 866 (10th Cir. 2012) (quoting *United States v. Kitchell*, 653 F.3d 1206, 1216 (10th Cir. 2011)). A traffic stop is justified at its inception if the stop is "based on an

observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *Id.* at 867 (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)); *see also Whitley*, 680 F.3d at 1232; *Kitchell*, 653 F.3d at 1216; *United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir. 1999).

4. Officer Colwell stopped Defendant based on a violation of N.M. STAT. ANN. § 66-3-846.1, which sets a light transmission requirement for the front-side, rear-side, and rear windows of motor vehicles. However, the windows behind the driver on some vehicles are exempt from the light transmission requirement, including "truck tractors, buses, recreational vehicles multipurpose passenger vehicles and motor homes." N.M. STAT. ANN. § 66-3-846.1(F). All of these phrases with the exception of "multipurpose passenger vehicles" have been defined by the New Mexico legislature. *See* N.M. STAT. ANN. § 66-1-4.2(C) ("buses"), 66-1-4.11(G) ("motor homes"), 66-1-4.15(F) ("recreational vehicles"), 66-1-4.17(S) ("truck tractors"). Though there is no comma between "recreational vehicles" and "multipurpose passenger vehicles," this appears to be a drafting or printing error, and reading the phrase as it is written would be nonsensical and unreasonable. Accordingly, the Court disregards the omission of the comma and, in order to reflect the obvious meaning of the statute, construes these phrases as indicating two separate types of vehicles. *See State ex rel. Helman v. Gallegos,* 871 P.2d 1352, 1359 (N.M. 1994) (noting with approval rule that typographical errors in a statute may be disregarded so that statute may be interpreted in manner that elucidates true meaning); *N.M. Glycerin Co. v. Gallegos,* 145 P.2d 995 (N.M. 1944) (construing substitution of "of" for "or" as "patently a typographical error."). The parties agree that,

though New Mexico law does not define "multipurpose passenger vehicles," the Federal Motor Carrier Safety Administration definition applies and includes Ford Expeditions. (Doc. 32 at 1-2; Doc. 33 at 4); *see also* 49 C.F.R. § 571.3.

5. An officer's reasonable mistake of fact may support the probable cause or reasonable suspicion necessary to justify the traffic stop. *See United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001) (citation omitted) (concluding that an officer had reasonable suspicion to stop a vehicle based on a visible crack in the windshield and that "[i]t is irrelevant whether the observed crack was, in fact, large enough to constitute a violation of the law."). However, an officer's failure to understand a plain and unambiguous law is not objectively reasonable. *United States v. DeGasso*, 369 F.3d 1139, 1143 (10th Cir. 2004) (citations omitted). Here, the United States has conceded that Officer Colwell's belief that the window tint regulation applied to the rear-side and rear windows of the Expedition was a mistake of law and that the traffic stop could not be justified by the dark tint on the Expedition's rear windows. (Doc. 33 at 3).

6. If the initial stop is justified and the driver is properly detained, the officers may conduct a search for weapons on the driver's person and in the passenger compartment of the vehicle upon "reasonable suspicion based on specific and articulable facts that . . . [the] driver may be dangerous and may gain immediate control of weapons . . . ." *United States v. Brakeman*, 475 F.3d 1206, 1212 (10th Cir. 2007) (quoting *United States v. Palmer*, 360 F.3d 1243, 1246 (10th Cir. 2004)); *see also Michigan v. Long*, 463 U.S. 1032, 1049 (1983). As with all reasonable suspicion inquiries, the Court must be guided by the totality of the circumstances to determine whether the officers were justified in believing that the driver might be dangerous and might gain immediate control of a weapon. *See*

*Palmer*, 360 F.3d at 1246. The totality of the circumstances analysis recognizes that, while each factor alone may not constitute proof of illegal conduct and may be consistent with innocent behavior, the factors taken together may amount to a reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989) (citations omitted). Courts "may not evaluate and reject each factor in isolation," as the "Supreme Court has expressly rejected this sort of 'divide-and-conquer' analysis." *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005) (citation omitted).

7. While New Mexico law requires courts to consider an officer's subjective reason for conducting a traffic stop, federal law does not. *Compare Whren v. United States*, 517 U.S. 806 (1996), *with State v. Gonzales*, 257 P.3d 894 (N.M. 2011). It is well settled that federal law, not state law, governs federal prosecutions. *See Elkins v. United States*, 364 U.S. 206, 224 (1960) ("The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed."). To determine the reasonableness of a traffic stop, this Court is bound to apply the Fourth Amendment law as interpreted and established by the federal courts, regardless of the jurisdiction of the officers involved. *See United States v. Miller*, 453 F.2d 731, 733 (10th Cir. 1971) (citing *United States v. Self*, 410 F.2d 984 (10th Cir. 1969); *Sablowski v. United States*, 403 F.2d 347 (10th Cir. 1968)).

**CONCLUSIONS OF THE COURT**

**Traffic Stop Was Justified at Its Inception.**

1. The Court concludes that the traffic stop of Defendant was justified at its inception. The fact that the front-side windows of the Expedition were darkly tinted and failed to comply with the light transmission requirements of the state statute is not disputed. The Court

credits Officer Colwell's testimony that the windows to the right and left of Defendant were rolled up when he passed Defendant's vehicle. Officer Colwell testified credibly on this point, and his testimony is bolstered by other evidence of record. Specifically, Defendant told Officer Colwell that he did not have his windows down "[b]ecause it's cold," the temperature was well below freezing with the wind chill, there were no other vehicles on the road, and Defendant admitted that he did not see Officer Colwell until the police vehicle was right behind the Expedition.

2. Therefore, Officer Colwell had a reasonable, articulable suspicion that an equipment violation had occurred, and he was justified in conducting the traffic stop.

**Protective Sweep of Passenger Compartment Was Justified.**

3. The Court concludes that Sergeant Zuniga's decision to conduct a protective sweep of the Expedition's passenger compartment was reasonable. The circumstances contributing to Sergeant Zuniga's reasonable suspicion that Defendant was dangerous, with ready access to weapons, included: (1) personal knowledge that Defendant was a suspect in shootings targeting two police officers; (2) knowledge of direct and indirect threats by Defendant against the officers conducting the stop; (3) knowledge that Defendant often kept weapons and items that could be used as weapons in his vehicle; (4) knowledge from prior encounters that Defendant almost always carried a knife on his person; (5) Defendant's failure to promptly stop after Officer Colwell activated his lights; (6) Defendant's behavior, which Sergeant Zuniga perceived as more nervous than in prior encounters with these officers; (7) Defendant's movement within the vehicle as Officer Colwell approached, including "digging" in the area of the center console and passenger seat; (8) both officers' observation of at least one knife protruding from the passenger

11

   side visor, which was within Defendant's immediate reach; and (9) the knife found on Defendant's person after he advised the officers that he did "[n]ot really" have one on him.

4. The protective sweep would have been justified by the presence of fewer than all of these factors. For example, the visible knives on the passenger visor and the knife on Defendant's person would generate a reasonable suspicion sufficient to search the passenger compartment of the vehicle, for "the presence of one weapon may justifiably arouse concern that there may be more in the vicinity, as turned out to be the case here." *United States v. Christian*, 187 F.3d 663, 669 (D.C. Cir. 1999).

5. Given the totality of the articulable circumstances, Sergeant Zuniga possessed a reasonable suspicion that Defendant was dangerous and could quickly access weapons from inside his vehicle. Accordingly, the Court finds the protective sweep of the passenger compartment justified.

**Traffic Stop and Protective Sweep Were Valid.**

6. Because the traffic stop was justified by Officer Colwell's reasonable, articulable suspicion of an equipment violation and the protective sweep was justified by Sergeant Zuniga's reasonable, articulable suspicion that Defendant was dangerous and might have had weapons within reach, the actual motivation of the officers is irrelevant. *See Whren*, 517 U.S. at 813.

7. Though Officer Colwell and Sergeant Zuniga are state officers, this is a federal prosecution, and the Court may only consider the constitutional protections afforded by federal law. The Court concludes that, regardless of whether there was a pretextual

reason for the stop, the officers' actions did not violate the Fourth Amendment because they are supported by lawful justifications.

**THEREFORE,**

**IT IS ORDERED** that Defendant Theodore Olguin's Motion to Suppress (Doc. 21) is **DENIED**.

_____
ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE